May it please the Court, my name is Laura Crank. I'm here on behalf of the appellant. I'd like to reserve three minutes for my rebuttal. The issues in this case are whether the ALJ provided clear and convincing reasons to reject the opinion of the treating doctors, and whether the ALJ provided clear and convincing reasons to reject the subjective testimony of Ms. Thornsberry. The reason that the ALJ did not provide clear and convincing reasons to reject the treating doctors is because it relied on the opinion of a state agency doctor. The opinion of a state agency non-examining doctor is insufficient, does not amount to substantial evidence to reject the opinion of a treating doctor. Why shouldn't we conclude that Dr. Patel's opinions were conclusory? We're not relying on Dr. Patel. Dr. Patel's opinion was only in regards to the physical impairment. Well, then why shouldn't we conclude that the other doctors' opinions were inconsistent with the record? Why shouldn't we conclude that the other doctors' opinions were inconsistent with the record? Well, the other doctors' opinions are not inconsistent with the record. The other doctors' opinions were based on mental status examinations over 10 to 12, and they showed objective evidence of psychiatric impairments, such as poor judgment, decreased memory, psychomotor agitation, decreased judgment, insight. She was having delusions of spiritual experiences. She read the record, but she also was able to participate in daily activities, go to the market, go take care of herself. Why don't her responsibilities or capabilities show that the evidence supports the denial of benefits when she was continuing on with her life? Despite her spiritual awakening or whatever happened to her, she was conducting her ordinary affairs. I don't think that's supported by the record. The record shows that she was spending most of her time alone, that what she did was able to dress herself and eat and perform some shopping, but that's not the Ninth Circuit has consistently held that a person does not have to be, does not have to vegetate in a room in order to be found disabled. They can perform their minor daily activities, and that's consistent with her. There's nothing in the record that shows that that's inconsistent with what she said she could do. She never said that she couldn't do those things. She has a psychiatric impairment, and the nature of her psychiatric impairment are that her symptoms wax and wane. She has major depressive disorder recurrent, also a borderline personality disorder, and those are expected to wax and wane. So, counsel, why wasn't the ALJ within its discretion in relying on the psychiatric review technique form that was filled out by Dr. Kahn? Well, I believe he relied on Dr. Gregg, who was the subsequent one, because Dr. Kahn found less limitations. The reason he wasn't, I'm sorry. Why couldn't the ALJ rely on that to support the non-disability finding? Because the case law says that he can't, that in order for the state agency, a state agency opinion is not enough to reject the opinion of a treating physician. And the state agency only relied on the findings of the treating physician. There's no independent clinical findings. What case says that the state agency physician opinion cannot be relied upon in contravention of a treating physician's opinion? What case says that? That's Ornithiastro. And it's also in small, it's also in well-developed case law. It says that the treating physician's opinion is entitled to more weight, but it does not preclude the ALJ from relying on a consulting physician if they're clear and convincing reasons, given why the opinion of the consulting physician is given greater weight. Dr. Gregg was not a consulting physician. He never met or interacted. Dr. Kahn. Or Dr. Kahn. There is no examining doctor in this record. It's missing. It's gone. It never existed. But they can be a consulting doctor without being an examining doctor, can't they? No, a consulting doctor is the same as an examining doctor. It's the non-examining state doctor is on the third, the bottom tier of the doctors that you're supposed to give weight to. It's kind of like a continuum. Even given that, the ALJ is not precluded from adopting the decision of the doctor at the lowest tier if he gives the reasons that are supported by evidence in the record for doing so. He can only accept the opinion of the state agency doctor if that doctor has independent clinical findings. The same diagnosis from Dr. Gregg as the treating physician, they're the same diagnoses, major depressive disorder with a personality disorder. It's only their conclusions that differ. Now, what case are you saying supports your argument that the ALJ could not rely on the state doctor's opinion? What case is that? It's Orn Viastru. Orn? Orn, O-R-N. But in some cases, a state agency doctor can amount to substantial evidence. But in order to do that, he would have to have independent clinical findings. And you're saying Orn says that? I believe it's Orn, yes. One second. So in your view, the ALJ cannot rely on a physician who just looks at all the medical records and renders an opinion as a result of looking at all the medical records? Yeah, that doctor cannot amount to substantial evidence. Now, let's say that there was other evidence in the record from a psychiatric case that's a little bit more difficult. But let's say there was an MRI or something in the record, and that doctor who generated that MRI had never given an opinion, and then the state agency doctor relied on that MRI. But in this case, if you review the state agency's opinion and his reasons, all he does is cite to the treating doctor's findings and conclusions, and he comes to the same diagnoses. So it's just a mere difference of opinion, and so there's a strong reliance on the treating physician in the Ninth Circuit and the regulations and the Social Security rulings. So I have Orn versus Astute. Show me the language in Orn that you're relying on to say that the state physician cannot serve as authority for the ALJ to make a finding of non-disability. I'm looking for the precise language that you can point me to. In Orn, it says when an examining physician, and we're not even talking about an examining physician in this case, so the standard would be even higher. We're talking about a non-examining doctor. Orn says, when an examining physician relies on the same clinical finding as a treating physician but differs only in his or her conclusions, the conclusions of the examining physician are not substantial evidence. Keep going. If the ALJ wishes to disregard the opinion of the treating physician, he or she must make findings setting for specific legitimate reasons for doing so that are based on substantial evidence in the record, right? Well, the ALJ is not a doctor. He's not qualified to decide what the diagnoses are and the findings are there. I would say he isolated the record. Actually, he was incorrect. He said there's absolutely no mental status examinations in the record. We've already noted there were 10 to 12. Okay. I understand your argument. What do you do with the Batson case? Batson v. Commissioner of Social Security, which says, however, an ALJ may reject a treating physician's opinion if it is conclusory, brief, and unsupported by the record as a whole or by the objective medical findings. Isn't that what the ALJ did here? He found the physician's opinion conclusory, brief, and unsupported by the record. Well, he would have to explain that, and I would argue that he's just wrong, that a review of the record shows that she had the objective findings based on the mental status examinations that were consistent with major depressive disorder, recurrent severe, and the personality disorder, such as the crying spells, the disheveled appearance, decreased judgment, insomnia, decreased mood, anxiety, all findings that are consistent with the doctor's conclusions. And the doctor treated her over the course of years. That also adds to the weight of the doctor's opinion. But, Counsel, didn't Dr. Kahn at least see the claimant once? No. There was no other doctor in the record that ever even met the claimant, only the treating doctors. And also the state agency opinion was rendered. There's additional records which show that her impairment actually increased in severity, continued in severity, that multiple new medications were administered, that her medications were doubled, showing an increase in severity, and the state agency doctor never even reviewed those because the state agency was in 2008 and many of the records are in 2009. Well, were they presented to the state agency or to the district court? They were in the record. They were before the judge, the ALJ, and definitely before the district court. All right. Did you say you're not depending on Dr. Patel's opinion? No, because we're just arguing the psychiatric impairment in this case, and Dr. Patel was. Okay, so I thought the record showed that maybe Dr. Kahn spoke to the claimant by phone. ER-366, I thought. You know, I believe, Your Honor, that he did speak to her once on the phone. But, again, that was just one day, and the case law is clear on this, and just the DSM-IV and psychiatric impairments in general wax and wane. And the record in this case covers years. And so there were some days where she said that she wasn't depressed and many other days that she said she was. I just wanted to clarify the record, because you said that Dr. Kahn's observations were based solely on reviewing the records. I'm sorry, Your Honor, I stand corrected. I do think that he had a phone call with her. All right. And then at this point, I'd like to have a few more seconds. I wanted just to mention the subjective complaints. We already went over that a little bit. But in this case, I also wanted to note that the decision in this case, the discussion of the treating doctor's opinion is only in one paragraph, that the entire decision is only eight pages, that the judge rendered his opinion two days after the hearing, and that he based his decision partially on Chavez, and that he relied on the state agency, Dr. Gray, who based his opinion and relied on Chavez as well. How old is your client now? Fifty-two. She's 52, and she is on benefits now. So she had another hearing? Yes, she did. And her deterioration continued? She met three listings. She met three listings? Psychiatric listings. Let me ask one more question. What does the record show evidence of changed circumstances to rebut the presumption of non-disability? Well, first of all, there's obviously new material evidence. That's the new treating record showing that she increased in severity. There's the RFC assessments by the treating doctors. That's sufficient. That's more than sufficient. I'm sorry. Are you finished answering? Yes, I am. Okay, so my question is, when did she begin getting benefits? She began getting benefits this year. But this isn't in the record, so I'm not really sure. I'm just trying to figure something out. She was found disabled soon after the final decision in this case. Okay, so what are you asking for? Since 2010, she was found disabled. Okay, so what's the relief here? Do you want what you're arguing for as benefits to go back to for back benefits? That's right. From 2008, which is her application, through 2010, which is the date of the judge's decision. So that's what the relief you're seeking ultimately here? Yes. Okay. If anything else, I'd like to save my next minute and a half for any rebuttal. All right, thank you, counsel. Thank you. May it please the Court, Jeffrey Chen, appearing on behalf of the Acting Commissioner of Social Security, Carolyn W. Colvin. I'd just like to start by clarifying a few things because there was some confusion about various tiers of physicians and the 9th Circuit President and how they interact in this court. The consultative examinations are essentially examining doctors who examine the claimant and provide a report based on their examination. This is characterized by the case Tonopetian v. Halter, and the 9th Circuit has held that consultative examination opinions serve as substantial evidence on their own, the report on its own, based on their independent clinical findings. But you still accord the treating physician the higher weight of authority unless you can point to specific and legitimate concerns that would allow you to not treat it as the authoritative opinion. That's right. And as a general matter, treating physicians are weighed more heavily because of their treating nature. In this case, the opinions of psychiatric state agent physicians, Dr. Kahn and Dr. Gregg, are state agency physicians. And contrary to plaintiff's argument and appellant's argument, in Bray v. Astrew, the opinions of state agency physicians can be substantial evidence as long as they are consistent with evidence in the record. Now I'd like to take a moment to explain exactly how the state agency physicians' opinions are consistent with the record. For example, mental status exams repeatedly show that appellant had linear logical thought processes, a thought content that was absent of delusions and paranoia, and fair insight and judgment. These examples can be found on the record on 599, 610, 612, 613, 619, and so on and so forth. Similarly, consistent with these modest mental status exams, the ALJ correctly observed that appellant was seen primarily for just medication support. The majority of progress reports documented that appellant's treatment consistently involved nothing more than routine medication refills. These can be seen on pages 290, 293, 295, 298, so on and so forth. Now, the treating physicians, Dr. Sivstov and Dr. Topekaru, opine that plaintiff was markedly limited in multiple spheres of functioning. They define markedly limited as seriously interfere with the ability to function independently, appropriately, and effectively. As the panel alluded to earlier, this is not borne out by the record, including claimant's own activities of daily living. Well, wait a second. Can you separate, I mean, all the doctors agreed that she had major depressive disorder, and you look at Dr. Tabakani's opinion, and he includes things like memory impairment, recurrent panic attacks, psychomotor agitation, difficulty thinking or concentrating, suicidal ideations. I can't read it. I think you know, page 601 of the record. And then that's remarkably consistent with Dr. Sivtsov, and the agency's physicians who reviewed these records also found the major depressive disorder as well. I don't understand how the fact that she could do minimal daily requirements of living undercuts these medical findings that all the doctors agreed on. Your Honor, there's two answers to that. First, there's no question that a palant does have serious medical issues. The ALJ found that a palant was limited to a limited range of sedentary work, unskilled work in terms of her mental capacity. Who's going to hire her? I mean, I look at these mental, I think the agency has a really hard time dealing with mental illness in general, but who is going to hire someone who has all these symptoms realistically? Realistically? I mean, would you hire her? Realistically, Your Honor, the Social Security Act is based not on hiring practices and based on whether a person with the functional capacity could still do work. I understand that. I agree with you that, you know, such an individual would have a difficult time finding employment. But the Social Security Act as written does not take into account whether someone would actually hire her, but whether someone with her functional capacity would be theoretically employable. I understand your concern, Your Honor, but the Social Security Act as written does not permit a finding of disability based on employment practices. Well, I understand, but I understand what the law says. But what sedentary jobs are there out there that the ALJ thought she could perform? Give me one moment, Your Honor. The ALJ accepted the testimony of a vocational expert who identified such work in the national economy such as touch-up inspector, jewel stringer. I just went. I'm sorry. Oh, sorry. Touch-up inspector. It's that. As I understand it, after completing assembly of a widget or an item, putting the final pieces of the object together, touching up an object in the manufacturing process, jewel stringer, which is putting together pieces of jewelry on the string, and lens inserter, which is placing lens into the appropriate holder or device holding the lens. What do those jobs require? The vocational expert did not testify as to specifically what the jobs required affirmatively, merely that these jobs were performable by an individual limited to sedentary, unskilled work with no more than occasional public contact or frequent contact with supervisors and coworkers. Did he take into account all these symptoms underlying her major depressive disorder in coming to that determination? In other words, was the appropriate hypothetical given to him? Well, yes, Your Honor. Allow me to explain. The hypothetical vocational expert does not include symptoms reasonably found not credible by the ALJ. So if I could move on briefly to discuss credibility factors, plaintiff is repeatedly engaged in behavior that undermines the credibility of allegations that she is totally disabled from a psychiatric standpoint. First and foremost is her behavior before the various physicians. Treating physician Dr. Daniela Tabakaru noted that appellant brought in a disability form seeking to suspend credit card payments because she was disabled, and she brought this form in filled out by herself. Dr. Tabakaru refused to sign the form because appellant had entered false information. When informed that the doctor refused to sign inaccurate information, the appellant became demanding and entitled. Similarly, her behavior before consultative examiner Dr. Thomas Sabourin showed a similar pattern. The appellant was very vague in describing her past work history, acted with a mild air of indifference about the entire examination proceedings, and the doctor found that her complaints appeared disproportionate to her discernible condition. In addition to these behaviors before the physicians, plaintiff has a long history of no-shows in her medical appointments as well as last-minute cancellations without any... I'm just wondering if that also would be a product of her mental disorder. I mean, if you have this suicidal ideation and depressive personality and everything that's been discussed about her, I mean, wouldn't that account for her not showing up, not getting her medicines, maybe not getting out of bed? And they also said she was disorganized and maybe she didn't keep track. I mean, there's so many things when you're talking about mental illness. I don't know how those things would... why those things aren't consistent just with her diagnosis. It could, Your Honor, but the facts in this case don't bear that out. As I explained earlier, and allow me to go through this list, her mental statics exam showed that Appellant had linear and logical thought process, thought content that was absent of delusion or paranoia, and fair insight and judgment. Furthermore, Appellant herself stated in a function report that she did not need any help or reminder to take her medications. This is on the record at page 208. The court statement in Molina v. Astor was equally pertinent here in that the court wrote, Appellant does not point to any medical evidence that her resistance was attributable to her mental impairment rather than her own personal preference. Isn't the ALJ supposed to consider that on his own under Social Security ruling 96-7P? Isn't he supposed to look at... he's required to consider information in the case, record of the case that would explain this behavior? Yes, Your Honor, but in this case, the ALJ, as I tried to explain earlier, found her generally not credible and not... her noncompliance was not as a result of her mental impairments but because of her general pattern of incredible behavior. So the ALJ did consider it and found Plaintiff incredible. In addition to her behavior before the physicians, Plaintiff's cancellation and no-shows were noted in 2007, 2008, and four times in less than a two-month period in 2009. So is the subsequent award of damage benefits a matter of public record? It would not be a matter of public record if there were no case filed in the district court. In this case, there wouldn't be because... So the ALJ's findings wouldn't be a matter of public record? Not as a general matter, Your Honor. The privacy and disclosure standpoint would prevent such medical evidence as a matter of course to be disclosed. But I understand... Not the ALJ's order. Obviously, somebody considered her subsequent condition and granted her benefits, right? Yes, and I wish to address that point exactly, actually. That's what I'm asking you to do. Appellant does not actually skirt over the Chavez v. Asher argument. In this case, the ALJ explicitly found at the administrative hearing identified this as a Chavez case with a presumption of non-disability. This statement was acknowledged and affirmed by appellant's counsel at the hearing. On the first page of the ALJ's decision, the ALJ furthermore explicitly stated that he found, in accordance with the prior ALJ decision and Chavez, that claimant can perform sedentary work activity. This is very significant because, as Judge Rawlinson alluded to, plaintiff's age. It's not surprising that plaintiffs... That wasn't me. It was me. It was me. I'm sorry. I'm Judge Rothoff. I'm sorry. Plaintiff's age is extremely significant in this case because plaintiff was, I believe, 49 years and 2 months at the time of the ALJ decision. Because of Chavez v. Asher, plaintiff's ability to perform a limited range of sedentary work, less than the full range of sedentary work, would have found her disabled based on the medical vocational guidelines. So in this case, Chavez helped appellant in this case by gridding her out in social security parlance at the age of 50. She would have turned 50, I believe. By what? What was the parlance? The grace? The medical vocational guidelines or the grids. Okay. It would direct a finding of disability in... Because of the advancing age? Correct. She would have gone from being a younger individual to an individual approaching advanced age. So Chavez v. Asher would have granted her disability as of February 2011 when she turned 50. So that's one benefit of being older. Yes, Your Honor. And this would answer Judge Wardlaw's earlier question. An older individual is presumed to be harder to adjust to more work. It's harder to be hired. It's harder to learn new skills. It's harder with limitations. The older you are, the less limited you have to be for the agent to find you disabled. And if you hire them, you can never fire them. So... No comment. So in this case, plaintiff does not make a Chavez argument in this case, but it is likely the basis for her subsequent grant of disability benefits. But turning back to this case, I just wanted to reiterate that plaintiff's credibility factors, including her bringing a false form to her treating physician, her non-cooperation with the consultative examiner, her repeated cancellation no-show without explanation, her admitted incompliance with her medications, all those adversely affect her credibility. And the ALJ reasonably found the standard in this court is that substantial evidence merely has to be that a reasonable mind would accept as adequate to support this adverse credibility finding. Certainly in this case, there's more than adequate facts to show. Can I ask you a question? I'm just curious. You're fighting over two years of benefits. How much money is that? I don't have the exact calculations. This is a... It doesn't have to be exact. What would be, say, the average amount of benefits that you're... Right. I was trying to explain because this is a supplemental security income application, there's a sliding scale based on plaintiff's income. So it could range anywhere from around $1,000 a month to as minimal as 50, if it's the very minimal amount. The appellant's income would be deducted from the eligibility benefits. At most, $24,000? If my understanding of the... Well, actually, in this case, the application was dated back to May 4, 2008. So the period because we are discussing... What period are we discussing? 208 to... I don't know the date of the subsequent... About three years. About three years. So we're talking $36,000. Plus attorney's fees, of course. Correct. If there are no further questions, I see that my time is up. We know we never send these cases to mediation, but it seems like an awful lot of attorney's fees and time and resources have gone into fighting over $36,000. Well, actually, Your Honor, the Social Security Administration does internally consider each case, even absent of mediation, and we do voluntarily remand cases both at the district court level and occasionally at the circuit court level. So it's not true that the agency simply defends these cases without regard to the facts. I'm just sort of asking, would you ever consider mediation? In the appropriate case, I think we have considered mediation. In this case, since it's a pure factual dispute, it would not be appropriate for mediation. But certainly in many cases, we have pursued and considered mediation. All right. Thank you, counsel. Thank you. Thank you. I'd just like to address some of the credibility issues that the appellee brought up. For example, the first one is when he cited the fact that Ms. Thornsberry brought in paperwork asking her doctor to help her so she didn't have to pay her credit cards because she didn't have any money, because she wasn't working and she was disabled. That was not a reason cited by the ALJ. That's a post hoc articulation made by the commissioner, and it's not appropriate before this court. In regards to her no-shows in the record, there's really no description by the doctors. It just says that she called and canceled her appointment. The primary function of medical records is to promote communication and record keeping for her doctors. And so we don't know if she had said something to her doctors or not. They just said she called and she canceled. Actually, there's other portions in the record when she was reporting for other physical impairments where they gave more detailed explanations of why she wasn't showing up or why she didn't come. There was only a few in the record. But in those ones it said it was because she didn't feel well. It's uncontroverted in this record that she has a litany of physical and mental impairments. The list is in the ALJ's severity finding. I think there's like 10 asthma, lumbar spine impairments, obviously asthma. And so if the judge didn't have any questions about this, he could have recontacted the doctor. He didn't do that. Instead, he based his decision on the opinion of the state agency doctor. In regards to the Chavez issue, first, Chavez is not strictly applied in Social Security. Let me just ask a question. Is it the duty of the ALJ to contact the doctors? If they think that anything in the decision is incomplete, inconsistent, or needs further development, they do have a duty to recontact. But he obviously didn't think it was incomplete and therefore did not contact the doctors. Well, he made the assumption that the no-shows. Well, actually, the no-shows, if there's no explanation for the no-shows, then we can see that it can affect a credibility analysis. But in this case, since she has a personality disorder and major depressive disorder, and there's other portions in the record which show why she wasn't attending the exams, and her own doctor, Dr. Tabakaru, wrote in his RFC assessment that it was her, that her mental health symptoms did affect her ability to take care of her own needs and to perform her daily activities and to take care of herself. And so that makes sense. And her doctors never cited that her no-shows or her lack of attending certain treatment sessions affected their conclusions. Obviously, they knew when she didn't show up, and they still assessed her with the limitations that they assessed. And I have a little bit more time, so... No, you're over. Am I over? Okay, well, then we rest. Thank you very much. Thank you very much. Thornsberry v. Colvin will be submitted, and we'll take up threads.
judges: Nelson, Wardlaw, Rawlinson